1  SHARON A. WATT [SBN 81377]
2  admin@filarskyandwatt.com
   FILARSKY & WATT LLP
3  408 Bryant Circle, Suite C
4  Ojai, California 93023
   Telephone   (805) 640-2970
5  Facsimile   (805) 640-2980

6

7  Attorneys for Plaintiff
   FALLBROOK UNION HIGH SCHOOL DISTRICT

8

   **FILED**

   08 JAN -8 PM 3: 07

   CLERK, U.S. DISTRICT COURT
   SOUTHERN DISTRICT OF CALIFORNIA

   BY: _____ PDV _____ DEPUTY

   UNITED STATES DISTRICT COURT
9  SOUTHERN DISTRICT OF CALIFORNIA

10                                              BY FACSIMILE

11 FALLBROOK UNION HIGH          )  CASE NUMBER:  '08 CV 0 0 4 9  H  AJB
12 SCHOOL DISTRICT,              )
                                 )  COMPLAINT FOR VIOLATION OF
13              Plaintiff,       )  THE INDIVIDUALS WITH
                                 )  DISABILITIES EDUCATION ACT
14                               )
15 v.                           )
                                 )
16 CHRISTOPER S., PAUL STRUBLE., )
   AND MARY STRUBLE,             )
17                               )
18              Defendants.      )
19  _____ )

20      Plaintiff FALLBROOK UNION HIGH SCHOOL DISTRICT

21 ("FALLBROOK") alleges:

22

23      1. FALLBROOK hereby brings this civil action pursuant to 20 U.S.C. §

24 1415(i)(2)(A).

25

26      2. On or about September 4, 2007, Defendant CHRISTOPER S. (hereinafter

27 "STUDENT"), by and through his attorney, filed a Mediation and Due Process

28 Request pursuant to 20 U.S.C. § 1415(b)(6), part of the Individuals with Disabilities

*Fallbrook Union High School District*
*v. Christopher S. et al.*                    1                    Complaint for Violation
                                                                    of the IDEA

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* STUDENT alleged that FALLBROOK violated provisions of the IDEA, and named FALLBROOK as the Respondent.

3. A special education due process hearing on the matter was held by the California Office of Administrative Hearings ("OAH") on October 16, 17, 18, and 19, 2007. The California Department of Education, a state educational agency within the definition of 20 U.S.C. § 1401(32), contracts with the OAH to conduct special education due process hearings pursuant to 20 U.S.C. § 1415(f).

4. A decision in STUDENT's special education due process hearing ("Decision") was issued by the OAH Hearing Officer on November 20, 2007. A full, true and correct copy of the Hearing Officer's Decision is attached hereto as *Exhibit 1* and incorporated herein by this reference.

5. FALLBROOK is an aggrieved party within the definition of 20 U.S.C. § 1415(i)(2)(A) to the factual findings, legal conclusions, decision, and order of the Hearing Officer in STUDENT's special education due process hearing.

6. Pursuant to 20 U.S.C. § 1415(i)(2)(A), FALLBROOK hereby brings a civil action with respect to the complaint and the request for a special education due process presented by STUDENT to the OAH pursuant to 20 U.S.C. § 1415(b)(6).

## JURISDICTION AND VENUE

7. This Court has jurisdiction.

(a)    This action arises under the laws of the United States. Subject matter jurisdiction is conferred upon this court pursuant to 20 U.S.C. §

1  1415(i)(2)(A) and 28 U.S.C. § 1331 without regard to the amount in

2  controversy.

3  (b)    FALLBROOK has exhausted its administrative remedies.

4

5  (c)    The parties to this civil action are located or reside within the Southern

6  District of California.

7  (i)    FALLBROOK is now and, at all times mentioned in this

8

9  Complaint, has been a public school district organized and

10  existing under and by virtue of the laws of the State of California

11  and does business within the County of San Diego, State of

12  California. Plaintiff FALLBROOK is a "local education

13

14  agency" within the meaning of 20 U.S.C. § 1401(19). Pursuant to

15  the IDEA, FALLBROOK provides a free appropriate public

16

17  education ("FAPE") to eligible children with disabilities whose

18  parents reside within its jurisdictional boundaries. See 20 U.S.C.

19  § 1401(9) (defining "free appropriate public education").

20

21  (ii)    Defendant STUDENT is a conserved adult who was born on

22  April 30, 1989, and is now approximately 18 years, 8 months,

23  old. STUDENT was a FALLBROOK student from fall 2003

24  until approximately May 3, 2007, when STUDENT stopped

25

26  attending Fallbrook High School, a FALLBROOK school.[1]  At

27

28

---

[1] For the 2003-2004 school year, STUDENT attended a nonpublic school as a FALLBROOK student. For the 2004-2005, 2005-2006, and 2006-2007 school years, until he stopped attending on or about May 3, 2007, STUDENT attended Fallbrook High School.

*Fallbrook Union High School District*
*v. Christopher S. et al.*                     3                     Complaint for Violation
                                                                      of the IDEA

all times relevant, STUDENT has lived in the County of San Diego, State of California.

(iii)   Defendants MARY S. ("MOTHER") and PAUL S. ("FATHER") are the parents of STUDENT, as that term is defined in the IDEA at 20 U.S.C. § 1401(23), and, at all times herein mentioned, were persons residing within the jurisdictional limits of Plaintiff FALLBROOK in the County of San Diego, State of California.

8.  Venue is properly in this Court pursuant to 28 U.S.C. § 1391(b).

(a)   All parties are located or reside in the Southern District of California. 28 U.S.C. § 1391(b)(1).

(i)   Plaintiff FALLBROOK is a local educational agency, as defined by 20 U.S.C. § 1401(19), which does business within the Southern District of California.

(ii)   Defendants STUDENT, MOTHER, and FATHER have at all times relevant resided within the Southern District of California.

(b)   A substantial part of the events and omissions giving rise to this claim occurred within the Southern District of California. 20 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

9.  On or about September 4, 2007, STUDENT filed with the OAH a Request for Mediation and Due Process Hearing ("Complaint") pursuant to the IDEA.

STUDENT named FALLBROOK as Respondent and as a party to the action.

10. The OAH heard the matter on October 16, 17, 18, and 19, 2007, in a special education due process hearing. The issues heard, as framed by the Hearing Officer in the matter, were:

(a)     Whether FALLBROOK failed to offer and provide a FAPE to STUDENT during the 2005-2006 school year when STUDENT was in the eleventh grade in one or more of the following ways:

    (i)     Failure to provide parents with options for STUDENT's graduation.

    (ii)     Failure to write any handwriting goals.

    (iii)     Failure to provide occupational therapy services for handwriting.

    (iv)     Failure to take appropriate action when STUDENT failed to make progress to meet goals.

    (v)     Failure to provide a behavior support plan, and/or failure to write adequate behavioral goals.

(b)     Whether FALLBROOK failed to offer and provide a FAPE to STUDENT during the 2006-2007 school year when STUDENT was in the twelfth grade in one or more of the following ways:

    (i)     Failure to write any handwriting goals.

    (ii)     Failure to provide social skills training.

    (iii)     Failure to provide occupational therapy services for handwriting.

    (iv)     Failure to timely provide communication logs.

(v)    Failure to timely provide a behavior support plan.

(vi)   Staff insensitivity to words and actions that trigger anxiety in STUDENT.

(vii)  Staff insensitivity to parental concerns.

(viii) Failure to provide any educational program (such as home hospital or itinerant teacher) after May 3, 2007.

(ix)   Failure to provide parents or STUDENT with options for graduation, and/or predetermination of placement.

(x)    Failure to provide a safe learning environment.

11. In the Decision, the Hearing Officer concluded as to the issues:

(a)    FALLBROOK denied STUDENT a FAPE during the 2005-2006 and 2006-2007 school years by failing to provide parents with options for STUDENT's graduation and predetermining STUDENT's placement at a June 2007 IEP team meeting  (issues (a)(i) and (b)(ix) of paragraph 10, *supra*).  *See* Decision, "Conclusions of Law, p. 32, ¶¶ 10-12.

(b)    FALLBROOK denied STUDENT a FAPE during the 2005-2006 and 2006-2007 school years by failing to provide handwriting goals (issues (a)(ii) and (b)(i) of paragraph 10, *supra*).  *See* Decision, "Conclusions of Law, pp. 32-33, ¶ 14.

(c)    FALLBROOK did not deny STUDENT a FAPE for the 2005-2006 and 2006-2007 school years because STUDENT did not require occupational therapy services relating to handwriting (issues (a)(iii) and

*Fallbrook Union High School District
v. Christopher S. et al.*                                      6                                Complaint for Violation
                                                                                                                          of the IDEA

(b)(iii) of paragraph 10, *supra*).  *See* Decision, "Conclusions of Law, pp. 32-33, ¶ 14.

(d)      FALLBROOK did not deny STUDENT a FAPE during the 2005-2006 school year because STUDENT made sufficient progress on his IEP goals (issue (a)(iv), *supra*).  *See* Decision, "Conclusions of Law, p. 33, ¶ 16.

(e)      FALLBROOK did not deny STUDENT a FAPE during the 2005-2006 and 2006-2007 school years because STUDENT did not require a behavioral support plan and the problem solving goal was sufficient to address STUDENT's behavioral issues during the 2005-2006 school year, FALLBROOK timely provided STUDENT with a behavioral support plan during the 2006-2007 school year, and FALLBROOK took action to correct any reports of bullying by peers or insensitive treatment by aides (issues (a)(v), (b)(v), and (b)(x) of paragraph 10, *supra*).  *See* Decision, "Conclusions of Law, p. 34, ¶¶ 18-19.

(f)      FALLBROOK did not deny STUDENT a FAPE during the 2006-2007 school year because FALLBROOK provided STUDENT with social skills training (issue (b)(ii) of paragraph 10, *supra*).  *See* Decision, "Conclusions of Law, p. 34, ¶ 20.

(g)      FALLBROOK did not deny STUDENT a FAPE during the 2006-2007 school year because FALLBROOK provided STUDENT's parents with timely communication logs (issue (b)(iv) of paragraph 10, *supra*).  *See*

*Fallbrook Union High School District*
*v. Christopher S. et al.*                          7                          Complaint for Violation
                                                                                of the IDEA

Decision, "Conclusions of Law, p. 34, ¶ 21.

(h)    FALLBROOK did not deny STUDENT a FAPE during the 2006-2007

school year because any insensitivity by FALLBROOK staff toward

STUDENT or his parents was not severe or prevented the parents from

participating in the process or constituted a failure to follow

STUDENT's IEP (issues (b)(vi) and (b)(vii) of paragraph 10, *supra*).

*See* Decision, "Conclusions of Law, pp 34-35, ¶ 22.

(i)    FALLBROOK did not deny STUDENT a FAPE during the 2006-2007

school year because it offered STUDENT an appropriate educational

placement from May 3, 2007, through the end of the 2006-2007 school

year (issue (b)(viii) of paragraph 10, *supra*). *See* Decision,

"Conclusions of Law, p. 35, ¶ 24.

12.  The Hearing Officer ordered that STUDENT is entitled to:

(a)    Have FALLBROOK convene a new IEP team meeting to discuss and

consider placements, goals, and services designed to help STUDENT

work toward a high school diploma.

(b)    Prevailing party status as to the following issues:

(i)    Whether FALLBROOK denied STUDENT a FAPE during the

2005-2006 school year by failing to provide parents with options

for STUDENT's graduation.

(ii)    Whether FALLBROOK denied STUDENT a FAPE during the

2005-2006 school year by failing to provide any handwriting

*Fallbrook Union High School District*
*v. Christopher S. et al.*                    8                    Complaint for Violation
                                                                    of the IDEA

goals.

       (iii)    Whether FALLBROOK denied STUDENT a FAPE during the
2006-2007 school year by failing to provide parents or
STUDENT with options for graduation and/or predetermination
of placement.

13. The Decision is final and not subject to reconsideration or further
administrative appeal. FALLBROOK is aggrieved by the Decision to the extent that
the factual findings of the Hearing Officer are contrary to the preponderance of the
evidence, the legal conclusions of the Hearing Officer are contrary to law, the
Hearing Officer determined that the District did not prevail on all issues to be heard
at the hearing, and the Hearing Officer ordered that STUDENT is entitled to relief.

## **CLAIM FOR RELIEF**

14. Each of the foregoing facts is incorporated into the claim for relief set
forth below.

15. FALLBROOK provided STUDENT with a handwriting goal during the
2005-2006 and 2006-2007 school years and provided appropriate instruction on
improving his handwriting during those same school years.

16. FALLBROOK provided parents with options for STUDENT's
graduation during the 2005-2006 and 2006-2007 school years and did not
predetermine Petitioner's placement.

17. The Decision of the Hearing Officer on the Issues listed in the paragraph
subsections numbered (a)(i), (a)(ii), (b)(i), and (b)(ix) of paragraph 10, *supra*, is not

*Fallbrook Union High School District
v. Christopher S. et al.*           9           Complaint for Violation
of the IDEA

supported by a preponderance of the evidence and is contrary to law.

18. The actions of the Hearing Officer, acting on behalf of the OAH, constitute reversible error because the Decision on the Issues listed in (a)(i), (a)(ii), (b)(i), and (b)(ix) of paragraph 10 was not based on the evidence presented at STUDENT's special education due process hearing and is contrary to law.

**PRAYER FOR RELIEF**

WHEREFORE, FALLBROOK prays for judgment as follows:

19. That those portions of the Decision finding that FALLBROOK failed to provide parents with options for STUDENT's graduation during the 2005-2006 and 2006-2007 school years, failed to discuss options/predetermined placement at a June 2007 IEP team meeting, and failed to provide handwriting goals during the 2005-2006 and 2006-2007 school years be set aside and/or overturned.

20. That the portion of the Decision that ordered that FALLBROOK shall convene a new IEP team meeting to discuss and consider placements, goals, and services designed to help STUDENT work toward a high school diploma be set aside and/or overturned.

21. That the portion of the Decision that found that STUDENT was a prevailing party on issues numbered (a)(i), (a)(ii), and (b)(ix) of paragraph 10, *supra*, heard at the special education due process hearing, be set aside and/or overturned.

22. That FALLBROOK was the prevailing party on the issue numbered (b)(i) of paragraph 10, *supra*.

23.    For a declaratory judgment that under the IDEA, FALLBROOK consistently offered STUDENT a FAPE.

24.    For a declaratory judgment otherwise affirming the remainder of the Decision of the Hearing Officer with regard to the issues on which FALLBROOK prevailed.

25.    For FALLBROOK's costs of suit, disbursements, and reasonable attorneys' fees.

26.    For such other relief as this Court deems just and proper.

Dated: January 8, 2008          Respectfully Submitted,

                         FILARSKY & WATT LLP

By: _____
                 Sharon A. Watt
                 Attorney for Plaintiff
                 FALLBROOK UNION HIGH SCHOOL
                 DISTRICT

*Fallbrook Union High School District*
*v. Christopher S. et al.*            11            Complaint for Violation
                                                     of the IDEA



BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

           Petitioner,

v.

FALLBROOK UNION HIGH SCHOOL
DISTRICT,

           Respondent.

OAH CASE NO. N2007090067

## DECISION

Administrative Law Judge (ALJ) Susan Ruff of the Office of Administrative Hearings, Special Education Division, State of California (OAH), heard this matter on October 16, 17, 18, and 19, 2007, in Fallbrook, California.

Ellen Dowd, Esq., represented Petitioner (Student) at the hearing. Student's mother was present throughout the hearing. Student was not present.

Sharon Watt, Esq., of Filarsky & Watt, represented Respondent Fallbrook Union High School District (District) at the hearing. Sallie Hunt, Director of Special Education, was present at the hearing on behalf of the District.

Student's due process complaint was filed on September 4, 2007. On September 7, 2007, the parties agreed to waive the 30-day resolution session period and proceed to hearing. At the close of the hearing on October 19, 2007, the parties requested time to file written closing argument. The matter was taken under submission on November 6, 2007, upon receipt of the parties' written closing argument. The parties stipulated that the deadline for preparation of the Decision in this matter would be extended until two weeks after the receipt by OAH of the written closing argument (November 20, 2007).[1]

---

[1] Because of the waiver of the resolution session period, the 45-day time limit for hearing and decision began to run the day after September 6, 2007. (Ed. Code, § 56501.5, subd. (d).) The parties stipulated to an

**EXHIBIT** ___1___

In the District's written closing argument, the District attached an exhibit and requested that the ALJ take official notice of that exhibit. Student filed an objection to that request. If the District wished to have its "exhibit" considered as evidence, the District should have produced the exhibit to Student's counsel prior to the hearing in accordance with the requirements of Education Code section 56505, subdivision (e)(7), and sought to introduce the document into evidence during the hearing. The District made no attempt to introduce the document into evidence or to keep the record open to permit the District to obtain the document. The District does not give a sufficient reason for attempting to introduce an "exhibit" after the close of evidence when Student has no chance to respond. The District's request is denied . (Ed. Code, § 56505, subd. (e)(8).)[2]

## ISSUES[3]

1.    Did the District fail to offer and provide a free appropriate public education (FAPE) to Student during the 2005-2006 school year when Student was in the eleventh grade in one or more of the following ways:

   a.    Failure to provide parents with options for Student's graduation.

   b.    Failure to write any handwriting goals.

   c.    Failure to provide occupational therapy services for handwriting.

   d.    Failure to take appropriate action when Student failed to make progress to meet goals.

   e.    Failure to provide a behavior support plan, and/or failure to write adequate behavioral goals.

2.    Did the District fail to offer and provide a FAPE to Student during the 2006-2007 school year when Student was in the twelfth grade in one or more of the following ways:

---

extension of the deadline to give the ALJ sufficient time to review the evidence and written closing argument of the parties.

   [2] To help provide clarity in the record, the District's closing brief was marked as Exhibit 94. Student's closing brief was marked as Exhibit X, and Student's Errata Pages were marked as Exhibit Y.

   [3] This list of issues is modified from the list in Student's due process complaint filed on September 4, 2007. During the hearing, Student requested and received permission to withdraw some of the issues in the due process complaint. In addition, a few of the issues listed above have been revised for clarification purposes. In its closing brief, the District states that "the Hearing Officer ruled that Petitioner would not be allowed to proceed" on certain issues. That characterization is not accurate. Instead, it was Student who requested and received permission to withdraw certain issues from this matter. The limiting of certain issues was also done at Student's request.

    a.     Failure to write any handwriting goals.

    b.     Failure to provide social skills training.

    c.     Failure to provide occupational therapy services for handwriting.

    d.     Failure to timely provide communication logs.

    e.     Failure to timely provide a behavior support plan.

    f.     Staff insensitivity to words and actions that trigger anxiety in Student.

    g.     Staff insensitivity to parental concerns.

    h.     Failure to provide any educational program (such as home hospital or itinerant teacher) after May 3, 2007.

    i.     Failure to provide parents or Student with options for graduation, and/or predetermination of placement.

    j.     Failure to provide a safe learning environment.

## FACTUAL FINDINGS

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?[4]*

1.     Student is an 18-year-old man who lives within the Fallbrook Union High School District. Student's parents have educational rights for Student. During the 2005-2006 and 2006-2007 school years at issue in this case, Student attended Fallbrook High School and was eligible for special education under the category of autism.

2.     Student contends that the District failed to provide Student and his parents with sufficient information regarding Student's graduation options, thereby denying Student a FAPE. Student also contends that the District made a predetermination of placement at the June 2007 IEP meeting. The law provides that parents have a right to participate in the development of the individualized education program (IEP) for their child. Part of their participation includes the right to be informed of the availability of FAPE and all available alternative educational programs, both public and nonpublic. On or before a Student's

---

[4] Because the same factual findings are necessary to decide both of these issues, they will be addressed under the same heading of this Decision.

sixteenth birthday, the Student's IEP must include information regarding Student's options for postsecondary goals and transition after high school.

3.      Student is considered to be in the "high-functioning" range of the autism spectrum. His cognitive ability is in the average range, but his disability impedes his academic and social progress. He has significant problems with communications, social interaction, auditory memory, perseverating on issues, and anxiety. His educational areas of need during the 2005-2006 and 2006-2007 school years included reading comprehension, math, social skills, problem solving and vocational skills. During those two school years Student was placed in a special day class (SDC) for most of his academic subjects because of significant academic delays.

4.      California law provides two different "tracks" by which a special education student can complete high school. If the student is capable of meeting the requirements to obtain a high school diploma, the student is said to be on a "diploma" track. If a special education student does not have the capability of meeting the requirements for a high school diploma, the child may be placed on a track which leads to a certificate of completion. For example, a certificate of completion might be awarded when a student's limited cognitive abilities make it impossible for the student to pass an algebra class necessary to earn a diploma or to pass the California High School Exit Exam (CAHSEE). The requirements for attaining a diploma from Fallbrook High School include passing an algebra class and passing the CAHSEE.

5.      A student who obtains a certificate of completion from the District can still participate in the graduation ceremony at the high school. In addition, community colleges such as Palomar Community College permit students without high school diplomas to enroll in some of the college classes.

6.      In some cases a special education student who completes high school and obtains a certificate of completion from the District may be permitted to return for another year of high school as a "super senior" or "second year senior."

7.      The District offers a "transition program" for special education adults after high school. The program is designed to teach adults the basic skills necessary for adult life and working in the community.

8.      There are also nonpublic schools which provide education to special needs adults after they have completed high school.

9.      Prior to reaching high school age, Student attended school in the Fallbrook Union Elementary School District. During Student's middle school years, Student began attending the Country School, a nonpublic school. During the 2003-2004 school year, Student's first year in the District, Student continued to attend the Country School at the District's expense. During the summer of 2004, Student was gradually transitioned to Fallbrook High School, which Student attended for Student's remaining three years of high

4

school. On May 3, 2007, about a month before the end of Student's senior year of high school, Student's parents pulled Student from the high school based upon the recommendation of Student's private psychiatrist.

10.     One of the main factual disputes in this case involves whether the District staff provided Student's parents with sufficient information about Student's options for graduation. Student's mother testified that at no time did the District staff inform Student's parents during any IEP meetings prior to June 2007 that Student would not achieve a high school diploma when he graduated from Fallbrook High School. According to Student's high school report cards, he received mostly As and Bs, and Student's mother believed he was doing well in his classes. She stated that she first learned Student would not graduate with a diploma late in the 2006-2007 school year, when counsel she had retained explained that to her. She said that the District staff never explained what the checked boxes regarding certificate of completion in the IEPs meant. Student wants to earn a diploma. Had Student's mother realized he was not on a diploma track, she would have taken steps to understand why or change it.

11.     The District witnesses dispute the testimony of Student's mother. The District contends that Student's mother was aware that Student was working toward a certificate of completion, not a diploma, at all times while he was at Fallbrook High School. Sallie Hunt, the District's Director of Special Education, testified that the issue of a certificate of completion was discussed at every single IEP meeting in which goals and objectives were discussed since the time Student transferred from the Country School, except possibly one IEP meeting called by Student's parents to discuss problems with Student's one-to-one aide. It was always understood that he was working toward a certificate of completion. Hunt described one conversation she had with the parents in the winter of the 2006-2007 school year, in which she stated that the only thing Student could not do without a diploma was join the military and that that was not an option for him.

12.     Other District witnesses supported Hunt's testimony. Margaret Martineau, the school psychologist who assisted with Student's social skills group during the 2005-2006 school year, testified that there was always discussion at the IEP meetings about certificates of completion, and they decided from the beginning that Student would be on a non-diploma track. Carla Crane, Student's case manager and special education teacher during his senior year, testified that she believed that Student's mother understood that Student would be getting a certificate of completion. Crane could not recall a specific conversation about the topic, but she stated that Student's mother made comments such as "I understand he is on a certificate program."

13.     In order to determine what information was or was not given to Student's parents by the District staff and the significance of that information, it is necessary to review

5

the IEP meeting reports, beginning with the May 21, 2003 meeting that occurred prior to the time Student began school in the District.[5]

    14.    Although Student was still in middle school and not yet within the jurisdiction of the District at the time of the May 21, 2003 IEP meeting, Sallie Hunt, the District's Director of Special Education, attended the meeting. Student's mother and father also attended the meeting. The notes of the meeting indicate that Student would be taking the "CAPA" (California Alternative Performance Assessment) rather than the standard state achievement testing given to all students. The CAPA is designed as an alternative test for students who are not performing at grade level. Under the preprinted language in the IEP stating "Differential Performance Standards for Graduation Required," the handwritten notation states: "to be determined." There is no mention in the IEP notes of any discussion regarding high school graduation or a high school diploma.

    15.    A follow-up IEP meeting was held in June 2003. Ms. Hunt also attended that meeting. There is no reference to high school graduation or certificates of completion in the IEP. In April 2003, Student's parents sent a written request asking that Student be exempted from statewide testing during Student's eighth grade year.

    16.    Student attended the Country School during his first year of high school. An IEP meeting was held on January 13, 2004, to review Student's progress and his placement at the Country School. On April 28, 2004, the District sent CAPA materials to the Country School for testing. The evidence did not establish whether Student took this test at the Country School. Student's mother testified that no one explained to her that Student would need to take the state's standardized achievement tests in ninth grade in order to obtain a diploma. School psychologist Margaret Martineau also could not remember an IEP discussion about whether exempting Student from taking high school standardized testing would prevent him from getting a diploma.

    17.    On May 11, 2004, Student's annual IEP meeting was held. Student's mother was in attendance. The "special factors" page of the IEP under the "transition" section contains a handwritten notation stating: "preparing for certificate of achievement." Miguel Espinoza, one of Student's special education instructors at Fallbrook High School the following year, attended the meeting. He could not recall whether there was a conversation at the meeting concerning a certificate of completion and admitted that the phrase "preparing for a certificate of achievement" could have been written before the meeting. The IEP stated that Student would take the CAPA. The remaining IEP meeting notes do not reflect any discussion about a certificate of completion or diploma.

    18.    Student began attending Fallbrook High School during the 2004-2005 school year. He took most of his academic classes in the school's "Bridge" program, an SDC

---

[5] These school years are prior to the statute of limitations period, but they are relevant to the current issue. If events at these earlier IEP meetings had given the parents the information they needed, there might have been no need for the District to give the parents the same information at a later date.

designed for pupils who, because of their disabilities, were unable to gain educational benefit from general education classes. Although the Bridge program is an SDC, it is possible for a pupil to start in the Bridge program and ultimately attain a high school diploma, depending on the pupil's individual abilities.

19.    On November 3, 2004, an IEP meeting was held to review the three-year (triennial) assessment done of Student. Ms. Martineau had administered cognitive testing as part of the triennial assessment. She reported to the IEP team that Student scored in the average range of intelligence on an untimed, nonverbal intelligence test. The handwritten notes of the meeting reflect Martineau's report.

20.    During the hearing, Ms. Martineau testified that she believed her test results were a fair measure of Student's true cognitive ability. She explained that Student's parents were very concerned about Student's anxiety and did not want him "melting down." Martineau had thought that Student might be able to make it on a diploma track, but the IEP team determined that it was better to make Student comfortable in the District's Bridge program with a modified curriculum. There are no specific handwritten notes in the IEP to reflect the team's decision to keep Student off a diploma-bound track. The IEP reflects that Student was reading at a fifth grade level and his math was at approximately a third grade level.

21.    Mr. Espinoza recalled that the team exempted Student from statewide assessments because they felt Student could not handle the anxiety or frustration of taking the tests, but Espinoza could not recall whether there was a discussion at the meeting about whether Student's failure to take tests would impede Student's ability to graduate with a diploma.

22.    The IEP reflects the team's decision to exempt Student from state testing. Under the California State Assessment heading, the notes contain the number "40." This was the District's numerical code indicating the parents had requested that Student not be involved in statewide testing. Another handwritten note beside it explained the reason as "parents' request." The IEP also noted that the "promotion standards" would be according to the IEP, not the District standards. The IEP meeting notes conclude that "An Individual Transition Plan will be written in May."

23.    The State or District Wide Assessment sheet in the IEP contains pre-printed language in tiny print stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion." That box has been checked on the document. There is large, handwritten language farther up on the page stating: "Significant academic delays in all areas preclude success on any/all CA standardized assessments."

24.    Aside from the checked box on the assessment page, there is no mention in the IEP meeting notes of a discussion regarding a diploma or certificate of completion. Ms.

7

Hunt, who took the notes at the meeting, explained that she does not record everything in her handwritten notes if there is already information on a topic elsewhere in the IEP.

25.    Student's transcript shows that Student got As in all his classes during his tenth grade year and mostly As during his eleventh grade year. Mr. Espinoza explained that Student's classes were special education classes which taught core curriculum, but at a modified level. An individual could tell they were special education classes by looking at the course number on Student's transcript. Espinoza testified that he had a discussion with the parents that the classes were special education. At some point during the 2005-2006 school year, Ms. Martineau spoke with Student about his long term goals, and he said he wanted to go to college. She thought it was a good goal for him – students in the District's Bridge program do attend college.

26.    On May 31, 2005, another IEP meeting was held. Student was having difficulty with the one-to-one aide assigned to him, and the team recommended that he work with classroom aides instead of having a one-to-one aide assigned to him. The notes reported that Student had made excellent progress in reading and was performing at a sixth grade level. The team determined that Student would be placed in a regular education classroom for life sciences and physical education the following school year.

27.    On October 19, 2005, an IEP team meeting was held. The meeting was called by Student's mother to discuss the situation with Student's aide support. Student's mother and father both attended the meeting. The meeting notes reported that Student had been moved from the general education science class to an SDC class. Student had been stressed and overwhelmed by the volume of work in the general education science class, and the work was too academically challenging for him, even when modified. The notes state that "Mr. Espinoza presented a draft of some Individual Transition Plan activities." The notes do not elaborate on what was discussed about those activities, and the IEP does not contain a copy of the draft.

28.    Student's next annual IEP review was held on November 30, 2005. Both of Student's parents attended the meeting. The IEP contained the same State or District Wide Assessment sheet as the November 2004 IEP had. Once again there was a box checked next to the tiny, pre-printed language on the form stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion." Mr. Espinoza explained that he wrote some of the handwritten notes on that page prior to others and identified some of the IEP notes as being written during the meeting. He said the box next to the statement regarding the certificate of completion was checked during the meeting.

29.    The evidence does not support Mr. Espinoza's statement in that regard. Mr. Espinoza testified from a photocopy of the exhibit. However, when the original exhibit was subsequently entered into evidence, it was clear that the comments written during the meeting were in blue ink while the ones written before the meeting were in black ink. The

mark in the box next to the certificate of completion language was in black ink, so the box was obviously checked prior to the start of the meeting.

    30.     The individualized transition plan (ITP) page of the IEP was also written in black ink, indicating that the form had been filled out prior to the meeting. The only blue ink on the page was in the page numbering at the top and the ink used to cross out the word "draft" which had been written on the page. The ITP had the box for "letter/certificate" checked instead of the box for "diploma." Under the heading of "unsubsidized part-time employment" the ITP listed the word: "Paleontology." No one at the meeting discussed with Student whether it was realistic for him to try to become a paleontologist. Under the heading "Part-time college" and the heading "regular wage scales" it stated "TBA." According to Mr. Espinoza, this meant "to be arranged." The ITP mentioned participation in the Community Based Instructional Program (CBI), but made no mention of attending the District's transition program after high school. The CBI program permitted a student to practice job skills in the community. The students worked at different job sites, learned about how to act at a job site, learned to fill out time sheets, and similar skills.

    31.     As with the November 2004 IEP, the California State Assessment section of the November 2005 IEP listed the word "40" based on the "parents' request." That was also written in black ink, indicating that it was filled out before the meeting. Someone had written in blue ink on the IEP that Student would attempt the reading portion of the "CAT-6" (the state standardized testing). The meeting notes (written in blue ink) mention that Student was making excellent progress in reading and would be moved to a resource English class from the Bridge program. The resource program was designed for Students who had a higher level of achievement than the Bridge Program, but were still not ready to be placed in a general education reading class. The blue-ink notes make no mention of an IEP discussion about a certificate of completion or diploma. Espinoza testified that it was not necessary to include that in the notes, because it was already listed in other places in the IEP.

    32.     Student's next annual IEP was held on November 27, 2006, during Student's senior year. Both of Student's parents attended the meeting. The IEP notes indicate that "Parents are concerned that [Student] is not ready to 'graduate' and/or move on to Transition program." The word "graduate" was placed in quotations in the IEP, but the District witnesses did not explain why. School psychologist Sandra Magaro testified that Student's parents did not ask questions about whether Student would get a certificate or diploma at that IEP meeting. They just talked about the graduation coming up.

    33.     The promotion criteria box in the IEP is checked for "District," not "IEP" as it had been the previous year. The graduation plan has a box checked beside a pre-printed statement: "To participate in high school curriculum leading to a Certificate of Completion." This pre-printed information is in larger type than the tiny statements regarding certificates of completion in the prior IEPs. Above that pre-printed statement is another pre-printed statement about attaining a high school diploma, which does not have the box checked.

34.    The meeting notes state that "[Student's] parents want him to be a second year senior next year. Mrs. Hunt suggested that he have a four period day with work activities in the afternoon." There is a page attached called "Transition Services" which recited that Student had not passed the California High School Exit Exam (CAHSEE) or an algebra class. It also showed that Student had completed 210 out of 230 credits needed for graduation. Hunt testified the purpose of having Student come back to high school the following year as a "super-senior," was not to enable Student to get a diploma. Instead, the District considered it because Student's mother, at that time, thought Student was "blossoming" in high school.

35.    Around December 2006 and January 2007, Student's parents began to investigate options for Student for the following year. In approximately January 2007, the District suggested that Student go to Palomar Community College and attempt the placement test. Student's parents were concerned that he was not ready to go to Palomar College. Ms. Hunt testified that there were also discussions about having Student attend the District's transition program the following year, and the parents went to visit that program in December 2006. On December 5, 2006, Student's mother sent an email stating, in part: "At this point we are looking at [Student] taking ROP to be a Vets Assistant – of course this may change before he graduates, but for now it appears do-able."

36.    Student continued to receive excellent grades during his time at Fallbrook High School. For example, Student received a B- in his computer class during his junior year and a B- in his first semester of his foods and nutrition class in his senior year. These were both general education classes, not SDC or resource classes. Webber Comella, the computer class teacher, testified that Student's grade was probably inflated, but gave no indication that he informed Student's parents of the inflated grade or reported that to Student's IEP team. On the few occasions when Student's grades in a class dropped significantly, Student's parents were concerned and sent emails to District staff to find out what had happened. For example, in March 2007, when Student's parents learned from a progress report that Student was getting a D+ in his foods and nutrition class, Student's mother sent an email to Student's case manager to find out what they could do to help bring his grade up.

37.    On February 12, 2007, Student signed a document entitled "Student's Statement Regarding School Attendance" which stated that "[Student] will participate in an Adult Transition Program" the following year. The document makes no mention of a diploma or certificate of completion.

38.    As discussed in Factual Findings 75 – 131 below, Student's behavioral problems began to escalate in the middle of his senior year. On March 21, 2007, the IEP team held a meeting to discuss Student's behavior support plan. There is no indication that the IEP team discussed the certificate of completion or diploma at that meeting.

39.    On May 3, 2007, Student's parents withdrew Student from Fallbrook High School based on the advice of Student's private psychiatrist. Student has not attended

10

Fallbrook High School or any other school program since that time and has been living at home with his parents.

40.    On May 10, 2007, another IEP meeting was held to review Student's triennial assessment. Although Student's three-year review was not due until November 2007, Student's parents wanted an update of how he was doing and the District wanted to help determine Student's placement for the following year. Therefore the District conducted the triennial assessment a few months early. The cover sheet of the IEP listed Student's "exit date" as June 14, 2007, and the "exit reason" as "72 Grad HS other than diploma." The IEP summarized Student's academic skills as follows: Reading: "Can read a 10th grade level literature text; has only literal level of comprehension;" Written Expression: "Can write a paragraph or a letter. Can use a wordprocessor and spell check;" Mathematics: "Can solve basic arithmetic problems without a calculator."

41.    The IEP had the box checked for certificate of completion under graduation plan. Student's mother testified there was no discussion at that meeting about the certificate of completion and she never noticed the box regarding the certificate of completion being checked. No one told her that Student would have to pass the CAHSEE to graduate. Ms. Hunt thought there must have been some discussion about a diploma at that meeting, because Student' mother wrote a follow-up email with a proposed goal involving algebra.

42.    Student's final IEP meeting during the 2006-2007 school year was held on June 7, 2007. It was held a week before the end of the 2006-2007 school year (which ended June 14, 2007). The IEP had a box checked stating that Student would earn a certificate of completion and another box stating that: "Beginning no later than grade 9" Student's parents must be informed that as of the 2005-2006 school year Student must pass the CAHSEE to obtain a diploma. Student's mother raised the issue of Student achieving a high school diploma during that meeting.

43.    For the first time in all the IEPs, the written meeting notes for the June 2007 IEP meeting describe a discussion regarding a high school diploma. The notes state: "[Student's mother] said [Student] would like to earn a high school diploma. Mrs. Hunt said the Algebra I and Geometry requirements will be stumbling block. Additionally, he will need to attempt and probably need to pass the Exit Exam. It is unlikely that Student could do that." During the lunch break of the meeting, Ms Hunt retrieved pages from the CAHSEE to demonstrate the difficulty level of the mathematics on the test. However, there was no discussion at the meeting regarding whether the "stumbling blocks" might be overcome, or whether, with appropriate education and supports, Student might be able to achieve a high school diploma. Student's mother believes that Hunt had "given up" on Student at that point. There was no further discussion of the subject at the meeting.

44.    The IEP team discussed two possible placements for Student during the meeting: either Student could return for another year at Fallbrook High School as a "super-senior" or Student could attend the District's transition program which is also located on the Fallbrook High School Campus. Student's mother did not want Student to return to

11

Fallbrook High School in either program and asked about a different school. The IEP meeting notes do not indicate that any discussion of other possibilities took place. No witness at the hearing indicated that other possibilities were discussed.

45.    On June 12, 2007, Ms. Hunt sent a follow-up letter to the parents with the District's final FAPE offer. The letter stated, in part: "I realize that the [parents] are still contemplating [Student's] academic potential. Nonetheless, the district is offering a placement at the Fallbrook Union High School District Transition Program."

46.    There are two relevant evidentiary considerations here: 1) what graduation options were discussed with the parents in the IEPs leading up to the District's final placement offer, and 2) what was discussed at the June 2007 IEP meeting where the placement offer was made?

47.    There is evidence to support both Student's and the District's positions regarding what was discussed at the pre-June 2007 IEP meetings concerning a certificate of completion/diploma. The strongest evidence in favor of the Student's position is the testimony of Student's mother. Student's mother was a credible witness. She was calm, direct and articulate in her answers. She is correct that anyone reviewing Student's transcript would see nothing to indicate he was not working toward a diploma – instead they would see what appeared to be a very good student who got mostly As and Bs. At all times the parents' actions were consistent with those of people who thought their son was working toward a diploma. For example, on the occasions in which Student's grades dropped, his parents immediately contacted the District to find out why. When Student's parents learned from their counsel that Student was not on a diploma track, they immediately addressed the issue at the IEP team meeting and requested IEP goals (such as an algebra goal) to help him on that path.

48.    In addition, the IEP documents themselves support Student's position. At no point do the handwritten notes written during the meetings reflect a discussion regarding a diploma track or certification of completion track until the June 2007 IEP meeting. Although boxes were checked on the IEP forms to show Student was working toward a certificate of completion, in at least one instance (the November 2005 IEP) it is clear that those were checked before the meeting, so they do not mean a discussion took place during the meeting.

49.    On the other hand, there is also evidence to support the District's position. The District witness testified that Student's parents understood Student was working toward a certificate of completion, not a diploma, although many of them could not recall specific discussions on the subject. Ms. Hunt testified that the subject of a certificate of completion was discussed at almost every meeting. However, the written IEP evidence does not support her statement. For example, the fact that the November 2005 IEP had all the information regarding testing and the tiny box regarding a certificate of completion marked prior to the meeting implies that there was no discussion.

12

50.     The strongest evidence for the District was the testimony of Margaret Martineau. In November 2004, when her testing revealed that Student had average intelligence, Martineau said there was a discussion about whether Student could earn a diploma and the team decided to opt for a path that would decrease Student's anxiety. However, it does not appear that this District understanding regarding the non-diploma path was adequately communicated to the parents. The District undoubtedly told the parents that the Bridge program and modified curriculum would be less stressful for their son. But did they plainly tell the parents that their choices would prevent their son from working toward a diploma? If so, one would assume that something would be written in the meeting notes. After all, the IEP team was making a momentous decision that placed a student who potentially had the intellectual capability of attaining a diploma on a track that would not lead to a diploma. Although handwritten notes are not required in an IEP, logic would indicate that *some* notation of that decision and the parents' understanding of the consequences of their choice would have been written in the meeting notes. The fact that such a notation is absent strongly indicates that no such discussion took place or that it was so watered down by the District staff that the parents never really understood the consequences of the choices they were making.

51.     The checked boxes on the IEPs are also evidence in favor of the District's position, but as stated above, in at least one case, it is certain the box was checked and information written prior to the meeting. The only time a hand-written notation appears (instead of just a checked box) in all the IEPs before June 2007, was in the May 2004 IEP, which occurred just prior to Student transferring from the Country School to Fallbrook High. There is a handwritten statement on the "special factors" page that says "preparing for certificate of achievement." That same page discusses Student's anxiety and need for modified instruction. That is some evidence that a discussion took place. However, the statement does not say "instead of a diploma" or mention diploma at all. Once again, there is no mention in the notes that the parents understood that their choices regarding Student's anxiety would prevent him from achieving a diploma. Student's mother testified unequivocally that she never understood he was not working toward a diploma.

52.     The November 2006 IEP contains an ambiguous handwritten statement about the parents' concern that Student was not ready to "graduate" and move on to the transition program. It was unclear why the word "graduate" was in quotation marks, but it does not prove there was a discussion about certificates of completion or diplomas. The parents could easily have believed that the transition program was just another place student could go after receiving his diploma, just as Palomar College was.

53.     Although there is evidence for both positions, Student's evidence is sufficient to "tip the balance" in Student's favor. No doubt the District employees were sincere in their belief that the parents understood, but the evidence does not support a finding that the District adequately informed the parents. Student met his burden of proving that the District committed a procedural violation of IDEA by failing to provide Student's parents with options for graduation.

54.     Likewise, Student has met his burden of proof on the issue of failure to discuss options/predetermined placement at the June 2007 IEP meeting. As discussed above, once the diploma issue was raised by Student's parents at the June 2007 IEP meeting, the discussion focused around why Student was not currently capable of attaining a diploma. There was no discussion of whether Student might be able to attain a diploma within two or three years, and if so, what would be the most appropriate program to help him attain that goal. There was no discussion of whether the District's transition program could help him work toward a diploma or whether there were other possible placements that could help him if the District's programs could not.

55.     It appears that, by June 2007, the District had given up on Student. In a December 13, 2006 email sent to Student's television technology teacher, Hunt talked about Student lacking the "intellectual capacity" to really learn in the class. When Student's mother mentioned the possibility of a diploma in the June meeting, Hunt brought in pages of the CAHSEE to prove how impossible that was. During her testimony, Hunt made it clear that the offer to have the Student return to Fallbrook High School as a "super senior" had nothing to do with Student earning a diploma.

56.     The evidence at the hearing showed that Student had made significant academic gains while in high school. His reading had improved from a fifth grade level to a tenth grade level. His math skills had also improved. Given the District's own assessment which found Student's cognitive ability to be in the average range, the progress Student made in high school, Student's desire to work toward a diploma, and his parents' concern about the issue, there should, at the very least, have been some discussion at the IEP meeting about whether there were supports or programs that might be appropriate for Student to help Student achieve a diploma. Instead, the District presented only two possible programs, neither of which would help Student work toward a diploma. The failure to have that discussion constituted a procedural violation of IDEA.[6]

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?[7]*

57.     Student contends that handwriting, particularly cursive writing, was an area of unique need for Student, and that the IEP should have contained goals and occupational therapy (OT) services to help Student make progress in that area. An IEP is required to contain goals and objectives to address a student's areas of unique need. In addition, a district is supposed to provide designated instruction and services (DIS services), including OT services, if those services are necessary for a student to benefit from special education.

---

[6] Whether these procedural violations led to a substantive denial of FAPE will be discussed in the Legal Conclusions, *infra*.

[7] These four issues have been grouped together in this section of the Decision, because they are based upon the same factual findings.

14

58.     A review of Student's IEPs shows that handwriting was recognized as an area of need for Student almost as soon as Student began attending Fallbrook High School. The November 3, 2004 IEP noted that Student's fine motor skill "displays weakness – especially with writing." Student's father told the IEP team that he would like to see Student's handwriting improve in "legibility, size and speed" and requested that a handwriting goal be included in the IEP. The IEP team added "smaller, legible handwriting" as part of a goal involving Student reading a passage and writing about that passage.

59.     That IEP goal continued in effect until Student's next annual IEP on November 30, 2005. The November 30, 2005 IEP notes state that Student's "fine motor skills are improving but [he] still lacks in strength. [Student] prefers to print rather than use cursive." That IEP contained no goal related to handwriting.

60.     The November 27, 2006 IEP contained virtually the same statement as the IEP from the previous year: "Fine motor skills are improving. [Student] prefers to print rather than use cursive." Once again, there was no handwriting goal contained in the IEP.

61.     On December 5, 2006, Student's mother sent an email to Carla Crane, Student's case manager, asking for a handwriting goal to be included in Student's IEP related to Student signing his name in cursive. Crane responded with an email stating that handwriting was a "classroom goal," but that a goal could be added to his IEP for that.

62.     At the March 21, 2007 IEP meeting the team added a goal that Student would be able to "sign his name in cursive without a model." The "baseline" for the goal stated that he could sign his name in cursive with a model. Crane presented this goal to the IEP team. Crane had noticed earlier in the year that Student was unable to sign his name, and the parents requested the goal, so the District decided to add it. Crane said she had worked on that skill with Student prior to March 2007, even though there was no IEP goal. The District's evidence included a sheet in which Student had practiced signing his name in cursive. Although the sheet was undated, Crane testified that it was created in January 2007.

63.     The May 10, 2007 IEP noted that Student "prefers to print but has been working on...writing his name in cursive without a model."

64.     Student and the District submitted various documents in evidence which contained Student's "signature." In very few of these did Student's "signature" appear in cursive writing. For example: On May 5, 2005, Student printed his name instead of signing it. He did the same thing on March 22, 2006. On June 6, 2006, Student properly signed his name in cursive on a document. However, after that, Student printed his name instead of signing it in documents dated November 27, 2006, February 12, 2007, May 3, 2007, and May 9, 2007.

65.     Student's teachers also differed in their opinions about whether Student could write his name in cursive. Mr. Espinoza thought that Student could accurately write his name in cursive. Lynette Shires, Student's foods and nutrition teacher during his senior year,

15

testified that Student never used cursive writing in her class. Kristine Heckman, who worked with Student in the CBI program, testified that Student was unable to sign his name when she worked with him. Ms. Martineau testified that Student is able to communicate in writing and does not need a writing goal. Sandra Magaro, the school psychologist who tested Student during the 2007 triennial assessment, believed that he did not need a handwriting goal because he can use a computer.

66.    Mary Reisman, Student's SDC teacher for the 2005-2006 school year, testified that teaching a pupil his or her cursive signature is a main priority of the SDC class, but she did not believe Student needed a handwriting goal because his handwriting was legible.

67.    Student's failure to write his name in cursive was not caused by a fine motor deficit. Sandra Magaro administered the Beery Developmental Visual Motor Integration Test to Student as part of the 2007 triennial assessment and determined that Student's fine motor skills are in the average range. Student's expert Cynthia Norall agreed that Student's writing issues were not due to fine motor problems. The documentary evidence showed that at various times Student was physically capable of signing his name in cursive, although it is not clear whether he was able to sign it without copying from a model.

68.    The evidence supports a finding that Student's 2005-2006 and 2006-2007 IEPs should have contained a handwriting goal regarding Student's use of cursive to sign his name. There is no dispute that using cursive writing to sign his name was an important area for Student to learn. The District's own SDC teacher discussed the importance of a cursive signature. It is also clear that a cursive signature was an area of need for Student. Student's use of a cursive signature was rare and did not appear to be generalized by him to environments outside of class. If he had an actual IEP goal instead of just informal classroom goals, his progress could have been monitored, and the IEP team could have determined whether he used the skill outside of the classroom. His failure to use cursive despite having the motor ability to do so should have been of concern to the IEP team and prompted a discussion during the IEP meetings.

69.    However, the evidence does not support a finding that Student required OT services relating to handwriting. All the testing done of Student indicated that his fine motor abilities were in the average range. He had the capability of signing his name and did sign his name on more than one occasion. Student presented no testimony from an OT expert to counter the District's triennial assessment findings. Student failed to meet his burden to prove that the District failed to provide Student with necessary OT services in the area of handwriting.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?[8]*

---

[8]  Since the failure of a Student to meet one or more of his or her IEP goals is not, in and of itself, a violation of IDEA, it is presumed that Student contends that the District failed to take appropriate action when the

16

70.    In Student's written closing argument, Student clarified that this contention involves Student's problem solving goal that was in his 2005-2006 IEP. Student does not contend that Student failed to make progress on his other goals, and the evidence shows that Student did make progress on other goals.

71.    Student's November 30, 2005 IEP contained a problem solving goal that stated: "By November 2006, [Student] will have learned two strategies for problem solving and will have used such strategy 4 or 5 times, when facing a difficult situation, as measured by case manager/psychologist records."

72.    School psychologist Martineau drafted the goal. It was based on a "four-step" method of problem solving that she had developed and used in the social skills group she ran. She added a fifth step when she worked with Student because of Student's unique behavioral needs. The speech-language therapist who supervised Student in the CBI program also worked with Student on this goal. Student made substantial progress on the goal during the 2005-2006 school year, although he did not fully achieve the goal. When Martineau retired at the end of the 2005-2006 school year, she reported his progress to Sandra Magaro, the school psychologist who took her place. They discussed the matter and determined that it would be best to keep the goal in the next IEP unchanged because he had not yet achieved it.

73.    The same goal appeared in the November 2006 IEP. Magaro carried the goal over into the next IEP unchanged because Student was new to her and she was not sure just how far he had come in terms of meeting the goal. When she worked with him, she saw progress on the goal, but he had still not met the goal so they continued to work on it.

74.    The evidence supports a finding that Student did make progress on this goal during the 2005-2006 school year. The testimony of Martineau and Magaro is undisputed that progress had been made. Student's good behavior and good grades between November 2005 and November 2006 also reflect the progress he made. There was no violation of FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a Behavior Support Plan (BSP), and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?*[9]

75.    When a Student's behavior impedes his learning or that of others, a school district is required to consider the use of positive behavioral interventions and supports, and other strategies to address that behavior. When a child exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the child's

---

goals were not met. However, because the evidence does not support a finding that Student failed to make sufficient progress, there is no need to reword this goal to clarify what Student intended.

[9] These issues are grouped together because they involve the same factual findings.

IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. Serious behavior problems include behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective.

76.    There is no dispute that Student's behaviors impede his learning. Every IEP that Student had during his time at Fallbrook High School noted that his behaviors impeded his learning. The November 30, 2005 IEP called for the following interventions to address Student's behavior: "Counseling, problem solving techniques, 're-grouping' time." In addition, the IEP contained a problem-solving goal related to behavior, as discussed in Factual Findings 70 – 74 above.

77.    Student had some behavioral incidents during the 2005-2006 school year. Prior to the November 2005 IEP meeting, Student's parents were concerned about the insensitive treatment of Student by his one-to-one aide, and a special IEP meeting was held on October 19, 2005. The aide was removed from working with Student. Student was also moved from his general education life sciences class to an SDC class because the stress of the regular class was overwhelming to him and caused him to have emotional "melt-downs."

78.    There was also an incident around October 2005, in which some boys were bullying Student. The substitute teacher in the class did not assist Student when Student spoke with the teacher about it. Student reported to his parents that when he spoke with Mr. Espinoza about it, Espinoza did not do anything about it either.

79.    The next incident in the 2005-2006 school year occurred five months later in March 2006, when Student was in a general education computer class. Student caught some other boys in class looking at a pornographic website and reported it to the teacher. Webber Comella, the teacher in that class, explained that Student was almost "euphoric" when he reported the improper conduct and thereafter continued to dwell on the episode, even after Comella told Student that he would deal with it. At one point, Student complained to his parents that there were "gang-bangers" in the class so he was afraid to attend the class, that Students were making fun of him, and that students were eating, drinking and jumping all around in class.

80.    Mr. Comella denied that students in his class were eating, drinking and jumping all around. He also denied that there were any "gang-bangers" in his class and denied that Student was afraid to come to his class. He explained that, when Student continued to dwell on the incident with the pornography website, Comella told Student that he could not keep going after the boys verbally or he would get in trouble. However, Comella denied that Student got in trouble with the other boys.

81.    There were no other significant behavioral incidents during Student's 2005-2006 school year.

18

82.    The parties dispute how accurate Student's representations were regarding the events that happened to him. Student's mother believed her son's reports of the events that happened at school and relied upon his version of events when she contacted the school about his behavioral issues. Student's mother was a very credible witness, but her information about events was only as accurate as the source from which it came. The evidence supports a finding that Student was not always accurate in his description of events and would sometimes exaggerate events or believe that events were directed at him when they were not. For example, at one point he complained that a sign-language interpreter and a deaf student were signing about him. However, when the teacher questioned Student, it turned out that he did not even understand sign language.

83.    Cynthia Norall testified as an expert witness on behalf of Student. Dr. Norall is an autism specialist who is the director of Comprehensive Autism Services and Education, Inc., an agency that provides services to county regional centers for autistic children. Dr. Norall is a licensed educational psychologist and has provided training for school districts. She has been employed by school districts in autism-related positions in the past.

84.    Dr. Norall explained that Student's disability causes him to dwell on events. He has a heightened sense of justice and can be very sensitive if he believes he has been wronged. He can relive an incident over and over in his mind, almost as if a video was playing. Because of his autism, he misreads social cues.

85.    The evidence does not support a finding that there were "gang-bangers" in Student's computer class. Instead, it appears that Student's perseveration on the "pornography event" caused him to exaggerate events and develop fears that were unfounded.

86.    The evidence also does not support a finding that Student needed a BSP during the 2005-2006 school year. The incidents in the early part of the school year were dealt with by removing Student's one-to-one aide and changing him to a less stressful science class. The later incident in March 2006 seems to be an isolated event. Although Student did perseverate about it, it did not keep him from completing the class or getting a B- in the class. Student's other grades for that school year also indicate he had a good year and Ms. Martineau's testimony confirmed that he made progress in his social skills and problem solving. The evidence also does not support a finding that the District failed to provide Student with sufficient behavioral goals during that year. As stated in Factual Findings 70 – 74, Student had a problem solving goal in his IEP. That problem solving goal was directly related to the heart of Student's behavioral problems – his perseveration about the actions of others.

87.    Student's behavior problems escalated during his senior year. In September 2006, Student reported an incident in which a girl told Student to stick out his tongue. When he complied, she pressed her two fingers on the side of his throat and asked him if it hurt. Ms. Crane sent an email to Student's mother stating that the teacher would watch the girl and her interactions with Student. There was no report of further incidents involving this girl.

19

88.     On September 22, 2006, there were email exchanges between the District and Student's parents about Student being unusually aggressive in class. However, Student's actions were due to medication issues and were resolved.

89.     On November 27, 2006, Student's annual IEP was held. The IEP team found that Student's behavior impeded learning. Under the statement "If yes, specify positive behavior interventions, strategies, and supports" the box was checked under "behavior goals." The IEP contained a goal on problem solving and a goal on initiating friendships.

90.     Between September and December, there were minor incidents between Student and other pupils, which were dealt with through an informal "mediation" process on campus.

91.     On December 7, 2006, Student was upset by the bullying of another boy in class. He went to the office of Ms. Magaro, the school psychologist who led his social skills group, and telephoned his mother. Magaro was about to start the group when he arrived. She asked him if she could start the group and then come back to talk to him. He agreed. She got someone else to facilitate the social skills group, but when she came back to speak to Student, he was gone.

92.     Student's parents came to the campus and learned that the campus police were looking for their son. Student's parents discovered Student sitting in a fetal position beside the chain link fence where his parents typically pick him up after school. He was very upset and later told them he did not want to go back to school.

93.     On January 18, 2007, a behavior support plan (BSP) was prepared for Student. It addressed Student's conduct in perseverating about other children's problems and perceived injustice.

94.     When the second semester of Student's senior year began, Student was bullied by other boys in his English class. On February 23, 2007, the boys squirted water on Student's back with water bottles. Student was very upset by this incident. On February 26, Student's parents took him to their private psychiatrist because Student suffered an emotional melt-down as a result of these experiences.

95.     Student began avoiding his English class. On some occasions he went to the office. On March 1, 2007, he left class and went to the "dungeon." The dungeon was a room next to the cafeteria which was used for meetings. It was somewhat hidden from the general student population of the school and Student felt safe there. Ms. Crane reported to the parents that Student was asking for passes to get out of some of his other classes as well.

96.     On March 1, 2007, Student's parents sent an email to Ms. Hunt which stated, in part, that the BSP was not working and requested that the school prepare a behavior intervention plan (BIP).

97.     Hunt sent an email in response to the parents on the same day stating, in part:
"A Behavior Intervention Plan is only written when the student's behavior is dangerous to
himself or others. I don't think [Student's] issues are truly dangerous but they are certainly
problematic." She said she would talk with Student's case manager and the school
psychologist about meeting to review the BSP.

98.     On approximately March 6, the District assigned a one-to-one aide to work
with Student in his English class.

99.     On March 8, 2007, Student skipped his fifth period English class and went to
the dungeon again. On March 9, 2007, Student was bothering another child in his fourth
period class. Crane chastised Student for it and kept him after class during fourth period.
She reported that he was unusually argumentative recently.

100.     Student suffered an emotional "melt-down" at home that night. When his
parents asked him about it, he said that a substitute teacher in the fifth period English class
had allowed the boys who bullied Student to play very loud music. Student has sensory
issues as a result of his disability and was troubled by the loud music. However, when he
asked to leave the class, he was told he could not.

101.     On March 16, 2007, Ms. Crane sent an email to Student's parents explaining
that Student had been quiet all week and had started attending fifth period again. Student
told his parents that he did not bother talking to Ms. Crane any more because it would not do
any good and that no one listened to him.

102.     On March 21, 2007, the District completed a Functional Analysis Assessment
(FAA) report and prepared a BIP. The FAA/BIP was reviewed at an IEP meeting held the
same day. Student's mother attended the meeting and took the plan home to discuss it with
Student's father. She signed her approval for the plan on March 23, 2007.

103.     During the week of March 29, 2007, Student's behavior improved. Student's
parents explained to Ms. Crane that they had promised him a reward if he behaved well that
week.

104.     During the following week (the week before spring break), Student's
behaviors escalated dramatically. On April 3, 2007, Student had an incident in a class in
which he struck another student. When confronted by the teacher, he first lied and said he
had not done so. When the teacher explained that both she and the aide had seen it happen,
he said the student was "bugging" him. However, the other student had been sitting quietly
at his chair. While the teacher went to check the other boy, Student went to the table and sat
down. He then slammed his hands on the table and flipped it over. The teacher had the aide
remove the other pupils from class and called for the school psychologist. She was able to
calm Student down. He said he did not know why he hit the other boy. It was just a
reaction.

21

105.   On April 4, 2007, Student's foods and nutrition teacher chastised Student in class. Student told his mother that the teacher said, "This is the last time I'm going to help you with this! Next time you are on your own!" Student reported that the teacher had said that modifying the work for Student was very labor intensive and that she was doing more work than Student was.

106.   Lynette Shires, the teacher in the general education foods and nutrition class, testified that Student's version of what happened was not completely accurate. She explained that she had given the pupils an assignment to write about vitamins and minerals and what effect they have on the body. She modified Student's assignment and made a special packet for him. He lost it twice, so she photocopied it a third time for Student's mother. Student was procrastinating and not working on the project in class. Shires told him that she wanted him to start working on it before she would help him. He became upset that she wanted him to do something that he did not want to do. Student was getting a D in the class because he was not completing assignments.

107.   On that same day, Student reported to his one-to-one aide that another child in his English class had thrown a paper and hit him in the head. The teacher and the aide did not see it happen or see any paper on the floor. When the aide was walking Student to his next class, Student began arguing with the aide about what she was supposed to do as part of his IEP. The aide felt offended that Student was telling her what to do. She did not know what was in his IEP. The District does not usually tell aides what is in an IEP, but instead instructs them regarding how to work with pupils as needed.

108.   On April 5, 2007, there was an assembly about driving safety for all the high school students in which there was an accident simulation. Student's parents felt this would be too upsetting for Student and asked that he be excused from it. Apparently there was miscommunication between District staff and Student went to the assembly anyway. It is not clear whether he was sent there by the teacher or went on his own when the other students went. Student was very upset by what he saw during the assembly.

109.   The same day, another student threw a "stink bomb" into Student's drama class. The parties dispute the facts of that incident. The campus security guard who gave Student's parents a ride to Ms. Crane's office reported that one of the other students in class threw the "stink bomb" at Student, hitting him in the hand. Ms. Crane reported that Student had hit the other boy. Student subsequently told his mother that a particular boy had run into the class, thrown the stink bomb at Student and hit him in the hand, then run off. When Student confronted the other boy after the other pupils had left class, the boy had called him names (including "retard" and "psycho") and accused him of making up the story. In response, Student hit the boy on the head.

110.   Florene Villane, the drama teacher, testified that a student from outside the room threw the "stink bomb" and it landed near a trash can. It did not hit Student. Student was concerned about the teacher and ran to pick it up. After he picked it up, he grew upset because he could not get the smell off his hands. She told him he could wash his hands, and

22

he went to the resource teacher's room. Villane said the boy that Student blamed for the incident did not throw the "stink bomb." The other boy could not have thrown it, because he was inside the class when the "stink-bomb" was thrown into the class from outside.

111.    The evidence supports Villane's version of the events. The "stink bomb" was thrown from outside class, so the boy blamed by Student could not have thrown it. It appears that the security guard who spoke with the parents had heard rumors and not the correct story. Student's version of the events is contradictory – if the other boy had run into the class, thrown the stink bomb, and then run off, how could the boy have still been in the room after class for Student to confront?

112.    Crane sent an email to the drama teacher in which she stated that Student "has started to become physical and we really need to address this. He has had a problem everyday this week."

113.    On Sunday, April 8, 2007, during spring break, Student parents sent an email to Hunt explaining that Student was seeing a private mental health professional, in part, because of their concerns about the incidents at school. They asked that the District immediately assign an autism consultant to assess the situation with Student.

114.    On April 16 and 17, 2007, after spring break, Student told his parents that he did not want to go back to Fallbrook High School and he did not feel safe there.

115.    On April 18, 2007, Hunt responded to the parents' April 8 email. She asked to meet with the parents and the mental health professional. She said the District did not have an autism consultant immediately available, but she would discuss seeking additional support and staff for Student after the meeting with the mental health professional.

116.    On April 19, 2007, Student's private psychiatrist Dr. Ong wrote a letter to Ms. Hunt which stated, in part:

> [Student's] current symptoms of anxiety, depression and anger outburst have been reportedly intensified by his current level of school placement. I have collaborated with Mr Mark Luciano (Educational Consultant) today and he feels the same way after a brief classroom observation while [Student] is in class. It is my opinion that current school placement for [Student] is not adequate in maximizing his educational & behavioral needs.

117.    On April 25, 2007, during Magaro's triennial assessment of Student, Student reported that he was very sad, did not want any further testing, and put his head down on the desk.

118.    On May 3, 2007, Student's parents pulled Student from school and did not let him return to Fallbrook High School.

119.   On May 9, 2007, Dr. Ong wrote another letter to Ms. Hunt, stating:

I saw [Student] last May 3, 2007 with our crisis therapist, Nancy Zieve, LCSW. Mother had picked up [Student] after school in an agitated state. His current school placement is not adequate in meeting [Student's] mental & emotional needs, subsequently, he is not learning to his potential. It is my recommendation that [Student] will be taken off his current school while placement in a new school is being assess (sic). Please feel free to collaborate with me with your concerns.

120.   Another IEP was held on May 10, 2007, to discuss the results of the triennial assessment. During the meeting, Ms. Hunt recommended that Student start seeing the school psychologist individually to help him deal with his anxiety so he could return to school. The IEP notes reflect that Student's mother "said she won't force him to do that."

121.   On May 14, 2007, Ms. Hunt sent a letter to Student's parents with a request for authorization to speak with Ong. Neither Student's parents nor Student consented to this request. Student's mother testified that, based on advice of counsel, she did not believe she could consent because it would violate Student's privacy.

122.   On June 7, 2007, the District provided an assessment plan to Student's parents, requesting their authorization to conduct a social/emotional behavior assessment of Student. Student's parents did not consent to that assessment. Student's parents requested an independent educational assessment of Student.[10]

123.   Student subsequently retained Cynthia Norall to conduct an independent assessment of Student. Dr. Norall reported that Student became distressed when she began asking him about how he got along in high school. He became more upset during the writing and mathematics portions of her assessment. Ultimately he "shut-down" and curled up in a fetal position in the waiting room. In her opinion, his reaction was because of the stress and anxiety that resulted from his time at Fallbrook High School. She believed that, because of his disability, he relived the incidents that occurred there over and over in his mind. She believes he should never go back there.

124.   Ms. Martineau, who worked with Student in the social skills group during his junior year, opined that Student's shut-down in Norall's office was probably because he was overwhelmed by the amount of testing Norall gave to Student. Martineau said that Student tended to shut-down when he was tired and felt overwhelmed by his school work. She would never have tested him as long on a single day as Norall did. Martineau's testimony, supported by her many months of working with Student, makes sense. It was the mathematics portion of the assessment which caused Student the most trauma, but there was

---

[10]   Student withdrew his request for reimbursement for Dr. Norall's independent assessment. The validity of the District's triennial assessment and the propriety of the District's June 7 request for a further assessment are not at issue in the instant case. There is a separate, District-filed case involving assessment issues.

no evidence that he suffered from bullying or teasing in his math class. Instead, it was the English class where most of the bullying took place.

125.    The evidence does not support a finding that the District failed to provide Student with a safe learning environment. Although some boys in Student's English class bullied Student and squirted him with water, the District responded by assigning a one-to-one aide to be with Student during that class. Aside from the bullying, there was no evidence of any physical danger to Student. The evidence did not establish that the "stink-bomb" was thrown at Student or even that it hit Student. Instead, aside from the water incident, the physical altercations involving Student during his second semester senior year involved Student hitting other boys, not the reverse. Student's feeling of being unsafe appears to be the result of his own perseverating over various events rather than the events themselves.

126.    Dr. Ong's letters do not change this. Although his second letter stated that the school was not meeting Student's mental and emotional needs, his letter does not elaborate on the basis for his opinion. Dr. Ong did not testify at the hearing and the District was not given leave to contact him. Although he recommended that Student not attend Fallbrook High any longer, he did not state that Student was unsafe there. Dr. Norall's opinion that Student was reliving events at school was important, but not enough to prove Student was unsafe. The evidence established that he exaggerated events in his mind when he perseverated on them, so what he was reliving may have been different from what actually happened.

127.    The evidence also does not support a finding that the District failed to timely provide a BSP or BIP. The incidents prior to December 2006 were minor difficulties with other students that were handled effectively with mediation. There was one serious incident in December, but most of Student's serious behavioral issues began during his final semester of his senior year.

128.    The District reacted to the second semester problems appropriately, first by preparing a BSP in January 2007. When the behaviors continued to escalate, the District conducted an FAA and prepared a BIP. Most of Student's severe behaviors occurred *after* the preparation of the BIP on March 21, 2007, not before, and occurred during the week before spring break. After Dr. Ong wrote his first letter in April 2007, Student continued to attend the high school until May 3, 2007. The evidence did not establish what triggered Student's "melt-down" on May 3 that caused his parents to withdraw him from school.

129.    The District followed the proper progression of moving from IEP supports, to a BSP to a formal FAA and BIP. Although Ms. Hunt told the parents on March 1, 2007, that no BIP was necessary, an FAA was conducted and a BIP was prepared and signed only three weeks later. Ms. Hunt's statement is not enough to prove that the District acted improperly.

130.    Student also contends that the behavioral goal in the IEP, which dealt with problem solving, was inadequate. However, it appears that it dealt with the heart of

Student's behavioral issues – his inability to deal with a problem with another student or in class.

131.   Student has failed to meet his burden of proving that the District denied him a FAPE by failing to provide a BSP or adequate behavioral goals during Student's 2005-2006 school year or by failing to timely provide a BSP/BIP or failing to provide a safe learning environment during the 2006-2007 school year.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

132.   School Psychologist Sandra Magaro provided Student with a social skills group once a week during the 2006-2007 school year. Student also had the option of coming to her office when he needed a sensory break. In Student's written closing argument, Student does not dispute that the social skills group meetings took place. Instead Student contends that Student should have had one-to-one social skills training or have been placed in a nonpublic school. The evidence does not support Student's position. Student's own expert Dr. Norall recommended that Student participate in her social skills group called a "friends club." There is also no evidence that Student's social skills training had to be provided by a nonpublic school. Magaro was well qualified to handle the social skills training. Although Dr. Norall recommended "social coaching" for Student with a behavioral aide, she did not testify that the social skills group provided by Magaro during Student's senior year was inadequate. Norall also believed that mediation was important for Student. The District witnesses testified that the school staff used mediation as a strategy for Student during Student's 2006-2007 school year.

133.   Student has the burden to show that the District failed to provide social skills training during the 2006-2007 school year. Student failed to meet that burden.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

134.   There is no specific requirement in IDEA that a school district provide a daily or weekly log of communications between the school staff and a child's parents. However, if the IEP calls for a log to be provided, then it must be provided.

135.   Student's parents have requested and received communication logs from the schools that Student attended before he came to the District. Student's May 11, 2004 IEP and November 3, 2004 IEP called for Student's parents to receive weekly progress reports. The November 30, 2005 IEP, on the other hand, called for only a progress summary report once a semester. The November 27, 2006 IEP does the same.

136.   The evidence in the file shows that in January 2007, Ms. Crane, Student's case manager, started sending weekly reports to the parents. However, even earlier in the year, there was a continual communication by email between Student's parents and Ms. Crane.

There was no lack of communication between Student's parents and the District staff at any time during the 2006-2007 school year.

137.   Student failed to meet his burden of proving that the District denied him a FAPE by failing to timely produce communication logs.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?[11]*

138.   Student contends that the attitude of District staff was insensitive toward words and actions that escalated Student's anxiety. While "insensitivity" is not a specific basis for a denial of FAPE, it is possible that sufficient insensitivity by school district staff might constitute a failure by the staff to comply with a student's IEP. The law requires a District to comply with the terms of an IEP in order to provide a student with a FAPE. Likewise, although the law does not specifically prohibit district staff from being insensitive toward parents, if that insensitivity rises to the level that it deprives the parents of the ability to participate in the IEP process, it could constitute a procedural violation of IDEA.[12]

139.   Student cites to several incidents in which the District staff demonstrated insensitivity to Student. On December 13, 2006, Ms. Hunt sent an email to Student's television technology teacher in which she stated that Student did not have the intellectual capacity for his class and the best Student might be in the television field is a "gofer."

140.   On January 10, 2007, Ms. Hunt complained to District staff that they needed a formal communication plan so that Student's parents "don't come running over here every time he sneezes." Hunt also demonstrated insensitivity by asking if Student was a bigot when Student had complained about other students bullying him in one of his classes.[13]

141.   As stated in Factual Findings 105-106 above, there was an occasion in which Student's foods and nutrition teacher grew impatient with Student because he was procrastinating on a project and spoke sternly to him.

142.   In addition, Student's parents filed a complaint in December 2006 because of rude treatment that Student's mother and Student had received from a traffic guard near the campus parking lot.

---

[11] These two issues are grouped together because the same factual findings support both.

[12] Student's counsel did not state the legal basis for these allegations in Student's written closing argument or cite to any cases relating to "insensitivity."

[13] Ms. Hunt's testimony also demonstrated her insensitivity to the parent's concerns. At one point during direct examination, Hunt went beyond the scope of one question asked by her counsel in order to comment that Student's parents complained about a teacher scolding Student for his flatulence in class. Hunt's testimony appeared to be designed to belittle Student's parents.

143.    Although there is no dispute that these comments were made or that they demonstrated a level of insensitivity toward Student and his parents, they are not sufficient to amount to a denial of FAPE, either procedurally or substantively.

144.    Ms. Hunt was not one of Student's instructors. She was an administrator at the school. Any insensitivity she displayed would not have affected Student or triggered anxiety on his part. Likewise, the parking attendant was not a trained educator who worked with Student on his IEP goals. The one incident with Student's foods teacher, even if it occurred in precisely the way Student described, was not alone enough to constitute a failure to comply with Student's IEP. There were many other staff members to whom Student could go for support.

145.    All of Student's teachers and counselors who testified at the hearing demonstrated genuine concern for Student's well being and a desire to help him with his education. While Hunt may have complained about Student's parents in her emails, her staff did their best to address the concerns of Student and his parents in a timely and courteous manner. The record is full of instances in which the staff responded quickly to emails sent by Student's parents and met with Student's parents to address Student's educational and behavioral issues.

146.    Student did not meet his burden of proving that the staff insensitivity toward him denied him a FAPE.

147.    Likewise, the evidence does not support a finding that staff insensitivity toward Student's parents constituted a procedural violation of FAPE. There is no indication that Hunt's comments regarding Student being a "gofer" or the parents rushing in "every time he sneezes" were sent to the parents or intended to be read by them. While these comments and Hunt's testimony do indicate a bit of a callous attitude toward Student's parents, that attitude did not prevent Student's parents from participating in Student's IEP process. These were not frightened parents who were cowed into accepting whatever a callous District forced upon them. Instead, these were concerned, dedicated parents who tried their best to work with the District, but were unafraid to challenge the District when necessary for their son's education. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

148.    Student contends that the District denied Student a FAPE by failing to provide Student with any education between May 3, 2007, when Student's parents pulled Student from high school, until the end of the school year on June 14, 2007. A school district is required to provide a continuum of program options, including home hospital or itinerant teachers, if necessary to meet a student's unique needs.

149.    Student's parents pulled Student from Fallbrook High School on May 3, 2007, based on Dr. Ong's recommendation. At the May 10, 2007 IEP meeting, Student's parents

requested that Student's assignments be sent home. Ms. Hunt told them that not all of the general education assignments could be done at home but that assignments could be modified to some degree. The District recommended that the school psychologist Ms. Magaro see Student on an individual basis to help deal with his anxiety so he could return to school. Student's parents refused.

150.    The District did not explore any other options for providing Student with an education at that meeting. The District did not call an emergency IEP or take steps to get Student back into school after that date.

151.    On May 14, 2007, the District sent a release to Student's parents and Student so the District could speak with Dr. Ong. As stated above in Factual Finding 121, Student's parents refused to sign it.

152.    On June 7, 2007, the final IEP meeting of Student's 2006-2007 school year was held. The District offered Student a placement for the 2007-2008 school year, but did not address the remaining school time in the 2006-2007 school year.

153.    Student did not attend Fallbrook High School from May 3, 2007, to the end of the 2006-2007 school year, and did not complete his final semester classes.

154.    The evidence does not support a finding that the District failed to provide Student with an educational program between May 3, 2007, and the end of the 2006-2007 school year on July 14, 2007. Student's parents pulled Student from Fallbrook High School based on the recommendation of Student's psychiatrist, but they refused to allow the District to speak with that psychiatrist to find out the basis for his opinion. The District requested authorization from both Student's parents and Student to speak with Dr. Ong. There was no evidence at hearing that the parents asked their son whether he would consent to have the District speak with Dr. Ong. In addition, Student's parents did not permit the school psychologist Ms. Magaro to speak with Student about returning to school. Dr. Ong's letter did not state that continued attendance at Fallbrook High School would be mentally or emotionally damaging or dangerous for Student. It merely said he was not "learning to his potential" there. That alone was not sufficient to warrant a home placement.

155.    Without input from Dr. Ong or Ms. Magaro, the District could only rely on its recent triennial assessment to determine an appropriate placement for Student for the remainder of the school year. That assessment did not find any basis for home hospital or itinerant teacher services. Based on that information, the District offered Student an educational program at Fallbrook High School between May 3, 2007, and the end of the school year. That offer was consistent with the legal requirement that the District provide FAPE in the least restrictive environment. There was no violation by the District.

29

*Factual Findings Related to Proposed Remedies*

156.    Student requests compensatory education in a nonpublic school (NPS) as a remedy for the District's denial of FAPE.  Student presented evidence related to the Fusion Learning Center and the services it provides.  However, the evidence established that the Fusion Learning Center is not a certified NPS with the State of California.  Student's expert Dr. Norall mentioned other possible schools, but Student provided no specific information regarding the programs at those schools or whether they would accept Student in their classes.  Dr. Norall believes that Student has the capability of attaining a diploma if an appropriate school program is provided.  Student wants to attain a diploma, but does not wish to go back to the Fallbrook High School campus.  Student's parents also wish to have Student work toward a diploma.

## CONCLUSIONS OF LAW

*Burden of Proof*

1.    The Student, as the party who filed the due process request, has the burden of proof in this proceeding.  (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

*The Requirements for a Free Appropriate Public Education*

2.    Under the federal Individuals with Disabilities Education Act (IDEA) and corresponding state law, students with disabilities have the right to a FAPE.  (20 U.S.C. § 1400 et seq.; Ed. Code, § 56000 et seq.)  FAPE means special education and related services that are available to the student at no cost to the parents, that meet the state educational standards, and that conform to the student's IEP.  (20 U.S.C. § 1401(a)(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).)

3.    In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176 [102 S.Ct. 3034] (*Rowley*), the Supreme Court discussed what is required for an offer of FAPE.  The court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  (*Id.* at p. 201.)  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is "sufficient to confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)  In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.)

4.    The congressional mandate to provide a FAPE to a child includes both a procedural and a substantive component. In *Rowley, supra,* 458 U.S. 176, the United States Supreme Court utilized a two-prong test to determine if a school district had complied with the IDEA. First, the district is required to comply with statutory procedures. Second, a court will examine the child's IEP to determine if it was reasonably calculated to enable the student to receive educational benefit. (*Id.* at pp. 205 – 207.)

5.    However, not every procedural violation of IDEA results in a substantive denial of FAPE. (*W.G. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484.) According to Education Code section 56505, subdivision (f)(2), a procedural violation may constitute a substantive denial of FAPE only if it:

(A)    Impeded the child's right to a free appropriate public education;

(B)    Significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(C)    Caused a deprivation of educational benefits.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?*

6.    Parents are an important part of the IEP process. Parents have the right to participate in the development of the IEP for their child and "to be informed of the availability under state and federal law of free appropriate public education and of all available alternative programs, both public and nonpublic." (Ed. Code, § 56506, subd. (d).)

7.    A district must have a continuum of program options available to special education students to meet their needs. (Ed. Code, § 56360.) The continuum of program options includes, "instruction in the home, in hospitals, and in other institutions to the extent required by federal law or regulation." (Ed. Code, § 56361, subd. (i).) "Services provided by nonpublic, nonsectarian schools, as defined pursuant to Section 56034, and nonpublic, nonsectarian agencies, as defined pursuant to 56035, shall be available." (Ed. Code, § 56365, subd. (a).)

8.    Beginning no later than the effective date of the IEP in effect when the pupil reaches the age of sixteen, the meeting must include consideration of postsecondary goals and transition services for the pupil. (Ed. Code, § 56341.5, subd. (e).)

9.    The IDEA contemplates that decisions will be made by the IEP team during the IEP meeting. It is improper for the district to prepare an IEP without parental input, with

31

a preexisting, predetermined program and a "take it or leave it" position. (*W.G., supra*, 960 F.2d, at p. 1484.)

10.     As set forth in Factual Findings 1- 56, the evidence supports a finding that the District failed to provide Student's parents with options for Student's graduation. While the District personnel understood that Student was being placed on a track that would not lead to a diploma, they did not effectively and appropriately communicate that to Student's parents.

11.     The failure of the District to adequately keep the parents informed constituted a procedural violation of IDEA. As set forth in Legal Conclusion 5, in order to determine if that procedural violation also constituted a substantive violation of FAPE, it is necessary to look at the factors set forth in Education Code section 56505, subdivision (f)(2). In the instant case, the second factor is the key. The failure to properly inform the parents about the options for Student's graduation significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to Student. Student's parents were making critical decisions regarding Student's classroom placement and testing. Without full knowledge that the choices they were making would affect their son's ability to attain a diploma, they could not make informed decisions. Their decisions could easily have been different if they knew the correct information.

12.     Likewise, the District's predetermination of placement at the June 2007 IEP meeting significantly impaired the parents' opportunity to participate in the decisionmaking process. The school presented two placement options, neither of which was intended to assist Student with possibly attaining a diploma. When the parents attempted to participate in the process, they were closed out without a discussion of other reasonable alternatives. Even though the District proposed two placements instead of the one placement proposed in the *W.G.* case, the District was still predetermining what the placement would be and then refusing to consider other options. The District's actions denied Student a FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?*

13.     An IEP must include a statement of measurable annual goals, including academic and functional goals designed to meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general education curriculum and meet each of the pupil's other educational needs that result from the disability. (Ed. Code § 56345, subd. (a)(2).) An IEP must also include related services (called "designated instruction and services" in California) which are necessary to assist an individual with special needs to benefit from special education. (20 U.S.C. § 1401(26); Ed. Code, § 56363, subd. (a).) These services may include occupational therapy. (Ed. Code, § 56363, subd. (b)(6).)

14.     As set forth in Factual Findings 57 - 69, the Student had needs in the area of handwriting with respect to the ability to sign his name in cursive. Student's IEP did not

address those needs until March 2007. Although Student worked on signing his name in class, he did not have the systematic oversight of an IEP, and, as a result, was very erratic on the use of a cursive signature. Student met his burden of proving that the failure to include a handwriting goal in the IEP denied Student a FAPE. However, Student did not meet his burden with respect to the need for OT services. All the individuals who assessed Student agreed that his writing problems were not caused by a fine motor deficiency. Student did not call an OT expert to state that Student required such services in order to consistently sign his name in cursive.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?*

15.     The law requires an IEP team to meet at least annually "to determine whether the annual goals for the pupil are being achieved, and revise the individualized education program, as appropriate, to address among other matters the following: (1) Any lack of expected progress toward the annual goals and in the general curriculum, where appropriate...." (Ed. Code, § 56341.1, subd. (d).) An IEP meeting must be called when the "pupil demonstrates a lack of anticipated progress." (Ed. Code, § 56343, subd. (b).)

16.     As set forth in Factual Findings 70 - 74, Student did not meet his burden of proving that Student failed to meet his goals during the 2005-2006 school year. Instead, the evidence showed that Student made substantial progress on the problem solving goal in question. The inclusion of the goal in the following IEP was not improper.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a BSP, and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?*

17.     When a child's behavior "impedes the child's learning or that of others," a school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i).) When a child "exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives" of the child's IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) Serious behavior problems are defined as "behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective." (Cal. Code Regs., tit. 5, § 3001, subd. (aa).) Before a BIP is developed, the district must conduct a functional analysis assessment (FAA). (Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) An FAA is a detailed assessment of a child's behavior, which includes, among other things, systematic observation of the occurrence of the targeted behaviors, systematic observation of immediate antecedent events associated with the behavior and the consequences of the behavior. (Cal. Code Regs., tit. 5., § 3052, subd. (b)(1).)

33

805 640 2980          Case 3:08-cv-00049-LAB-CAB     Document 1     Filed 01/08/2008 8:pm. Page 45 of 53     48/54

Tuesday 20 of Nov 2007, Faxination                  ->805 640 2980          Page 35 of 39

18.   As set forth in Factual Findings 75 - 131, Student did not meet his burden of showing that the District failed to respond appropriately to Student's behavioral issues. The few behavioral incidents that Student had during the 2005-2006 school year were easily handled by the IEP supports in place. There was no need for a BSP or any behavior goals besides the problem solving goal in the IEP. When that situation changed during the middle of the 2006-2007 school year, the District responded appropriately, first with a BSP and then a BIP.

19.   Student also failed to meet his burden to show that the District failed to provide him with a safe learning environment. On each occasion that Student was subjected to bullying by peers or insensitive treatment by aides, the District took action to correct the circumstance. Because the District had no opportunity to speak with Student's psychiatrist and because the parents would not let Student talk to the psychologist after May 3, 2007, the District was hampered in its efforts to provide any changes necessary to deal with Student's continued "melt-downs." There was no denial of FAPE in this regard.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

20.   As set forth in Factual Findings 132 – 133, the evidence did not establish that the District failed to provide Student with social skills training. There was no denial of FAPE.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

21.   As set forth in Factual Findings 134 – 137, the evidence did not establish that the District was required to provide a communication log to the parents during the 2006-2007 school year. There was no requirement in the IEP for such a log and Student has cited to no legal authority that a District must produce a communication log to all parents of special education pupils. The District began providing weekly updates in January 2007, but even before that, there was constant email communication between Student's parents and the District. There was no procedural violation and no denial of FAPE.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?*

22.   Student cites to no legal authority stating that staff insensitivity may constitute a denial of FAPE. However, it is possible that, if the District's insensitivity prevents meaningful participation by the parents in the IEP process, it might constitute a procedural violation. In addition, if District staff is insensitive to a special education student's needs to the extent that the District is no longer following Student's IEP, it might constitute a denial of FAPE. As set forth in Factual Findings 138 – 147, Student did not meet his burden of showing that any insensitivity by District staff toward Student or his parents was severe

34

enough to prevent the parents from participating in the process or constitute a failure to follow Student's IEP. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

23.    As stated above in Legal Conclusion 7, a district must have a continuum of program options available for special education students. Special education and related services may be provided in the home or hospital if the IEP team recommends such instruction or services. (Cal. Code Regs., tit. 5, § 3051.4, subd. (a).) "For those individuals with exceptional needs with a medical condition such as those related to surgery, accidents, short-term illness or medical treatment for a chronic illness, the individualized education program team shall review, and revise, if appropriate, the individualized education program whenever there is a significant change in the pupil's current medical condition." (Cal. Code Regs., tit. 5, § 3051.4, subd. (c).) When recommending placement for home instruction, the IEP team must have a "medical report from the attending physician and surgeon or the report of the psychologist, as appropriate, stating the diagnosed condition and certifying that the severity of the condition prevents the pupil from attending a less restrictive placement." (Cal. Code Regs., tit. 5, § 3051.4, subd. (d).)

24.    As set forth in Factual Findings 148 – 155, the District provided Student with an educational program in the Fallbrook High School between May 3, 2007, and the end of the school year. According to the triennial assessments conducted by the District shortly before the May 2007 IEP meeting, that was the appropriate program for Student. Based on a letter from Student's psychiatrist, Student's parents pulled Student from the high school on May 3. However, neither Student nor his parents gave the District permission to speak with the psychiatrist, and Student's parents declined an offer to have the District's psychologist speak with Student. The psychiatrist's letter dealt with Student's learning potential, not any physical or mental harm that would result from his placement in the high school. Without anything more, it would not have been appropriate for the District to place Student in a home environment. There was no denial of FAPE.

*What is the Appropriate Remedy for the Denial of FAPE?*

25.    As stated above in Legal Conclusions 1 – 24, the District failed to provide Student with a FAPE during the 2005-2006 and 2006-2007 school years because the District failed to inform Student's parents regarding Student's graduation options, predetermined Student's placement during the June 2007 IEP meeting, and failed to provide Student with a handwriting goal related to signing his name in cursive writing until March 21, 2007. Student seeks compensatory education "at a certified NPS, with all services, and with special education transportation" to remedy the denial of FAPE.

26.    Compensatory education is an equitable remedy designed to "ensure that the student is appropriately educated within the meaning of the IDEA." (*Parents of Student W v. Puyallup School District, No. 3* (9th Cir. 1994) 31 F.3d 1489, 1497.) There is no obligation

to provide a day-for-day compensation for time missed. The remedy of compensatory education depends on a "fact-specific analysis" of the individual circumstances of the case. (*Ibid.*) The court is given broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996].)

27.      Looking at the facts in the instant case, it is questionable whether Student needs compensatory education at all. As set forth in Factual Finding 56, Student made significant educational progress while in high school. He went from a fifth grade reading level to a tenth grade reading level in three years. His math skills also improved greatly. Although placement is not at issue in this case, the evidence introduced at the hearing indicated that Fallbrook High School was the appropriate placement for Student in the least restrictive environment for the three years Student attended there. It is partly because of Student's significant progress that attaining a high school diploma is a possibility for him at this time.

28.      On the other hand, even though Student made educational progress in his high school years, he was not progressing toward a diploma because of the choices the IEP team made. If his parents had understood the consequences of their choices, they might have made other choices. For example, they might have encouraged standardized testing of their son rather than agreeing to exempt him from testing every year. They might have asked for more goals in mathematics, such as the goals they sought in June 2007, once they realized that he needed algebra to graduate.

29.      The evidence has established that Student lost educational opportunity due to the District's failure to properly inform his parents about his non-diploma track. Some measure of compensatory education is appropriate.

30.      The more difficult question is what type and/or amount of compensatory education would make up for the educational opportunities which Student lost. The District's transition program is not designed to give Student the opportunity to work toward a diploma. Based on Ms. Hunt's testimony that allowing Student to return to high school as a "super senior" was not intended to allow Student to earn a diploma, it does not appear that another year at Fallbrook High School is the appropriate compensatory remedy.

31.      However, Student presented very little evidence on the subject of the appropriate compensatory remedy. The Fusion Learning Center is not a state certified NPS, and Student did not present specific evidence about other NPS programs. Under these circumstances, Student did not meet his burden of proving that an NPS placement should be ordered to provide compensatory education to Student.

32.      The appropriate remedy under these circumstances is to require the District to hold a new IEP meeting to allow the IEP team to discuss appropriate placement and services to permit Student to work toward a high school diploma.

33.    A new IEP meeting will also remedy the denial of FAPE based on predetermination of placement. Because the District predetermined the proposed placement at the June 2007 IEP meeting, the District failed to consider other possible options for Student's education. The appropriate remedy is to order the District to hold another IEP meeting to consider a placement which will permit Student, with appropriate supports and services, to work toward a diploma. The IEP meeting should be held at a time when Student's expert Dr. Norall and/or any other experts Student wishes to invite to the meeting may be present. The IEP team should specifically address the issue of placement, services and supports necessary to help Student work toward a diploma. Possible NPS placements should be considered by the IEP team. If the IEP team is unable to agree upon an appropriate placement, nothing in this Decision would stop either party from seeking further relief through a future due process proceeding.

34.    The IEP team should also make certain that a handwriting goal for Student's cursive signature is included in Student's next IEP. That will be sufficient to remedy the failure to include a handwriting goal in the past IEPs.


## ORDER

1.    The District is ordered to schedule a new IEP meeting within 30 days of the date of receipt of this Decision. The meeting will be scheduled at a time convenient to Student, Student's parents, Student's counsel, and any experts Student chooses to bring to the meeting.

2.    At that meeting, the IEP team will discuss and consider placements, goals and services that are designed to help Student work toward a high school diploma, including NPS placements.

3.    Nothing in this Decision is intended to prevent either party from filing a further due process proceeding regarding any proposal made at that IEP meeting.


## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. In accordance with that section the following finding is made: Student prevailed on Issues 1 (a) and (b), and 2 (i). The District prevailed on the remaining issues.

### RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within 90 days of receipt of this Decision in accordance with California Education Code section 56505, subdivision (k).

Dated: November 20, 2007

SUSAN RUFF
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

1   SHARON A. WATT [SBN 81377]
2   admin@filarskyandwatt.com
    FILARSKY & WATT LLP
3   408 Bryant Circle, Suite C
4   Ojai, California 93023
    Telephone   (805) 640-2970
5   Facsimile    (805) 640-2980

6

7   Attorneys for Plaintiff
    FALLBROOK UNION HIGH SCHOOL DISTRICT

8

9            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA

10

|  |  |
|---|---|
| 11  FALLBROOK UNION HIGH | ) CASE NUMBER: |
| 12  SCHOOL DISTRICT, | ) |
| 13         Plaintiff, | ) CERTIFICATION AS TO |
| 14 | ) INTERESTED PARTIES |
| 15  v. | ) |
| 16  CHRISTOPER S., PAUL STRUBLE, | ) |
| 17  AND MARY STRUBLE, | ) |
| 18        Defendants. | ) |
| 19 | ) |

20

21       The undersigned, counsel of record for Plaintiff FALLBROOK UNION HIGH

22  SCHOOL DISTRICT, a public entity, certifies that the following listed parties have

23  a direct, pecuniary interest in the outcome of this case.  These representations are

24  made to enable the Court to evaluate the need for disqualification or recusal.

25

26  ///

27  ///

28

1   Defendant CHRISTOPHER S.

2   Defendant PAUL STRUBLE

3   Defendant MARY STRUBLE

4

5   Plaintiff FALLBROOK UNION SCHOOL DISTRICT, a public entity.

6   Dated: January 8, 2008                    Respectfully Submitted,

7

8                                              FILARSKY & WATT LLP

9

10  By: _____

11                                             Sharon A. Watt
                                               Attorney for Plaintiff
12                                             FALLBROOK UNION HIGH SCHOOL
                                               DISTRICT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
FALLBROOK UNION HIGH SCHOOL DISTRICT

**DEFENDANTS**
CHRISTOPHER S., PAUL GORUBLE, MARY GRUBLE

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Sharon A. Watt, 408 Bryant Cir #C, Ojai CA 93023 (805) 640-2970

Attorneys (If Known)
Ellen Dowd, 2658 Del Mar Heights Rd#228, Del Mar CA 92014

FILED
08 JAN 8 PM 3:11
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

**08 CV 0049 H AJB**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. section 1400 et seq.
Brief description of cause:
Appeal of Administrative Due Process Decision under Individuals with Disabilities Education Act

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE
DOCKET NUMBER

DATE
01/08/2008

SIGNATURE OF ATTORNEY OF RECORD
*Sharon A Watt*

FOR OFFICE USE ONLY

RECEIPT # 146228   AMOUNT $350   11810854   APPLYING IFP    JUDGE    MAG. JUDGE

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 146228     — BH
* * C O P Y * *
January 08. 2008
15:09:19

### Civ Fil Non-Pris
USAO #.: 08CV0049 CIVIL FILING
Judge..: MARILYN L HUFF
Amount.:                $350.00 CC


Total—>   $350.00


FROM: FALL BROOK UNION H.S. V. TRUBL
      CIVIL FILING
      VISA AUTH# 012261